NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 23

No. 2016-269

| | |
|---|---|
| Wilbur L. Shriner | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| Amica Mutual Insurance Company | January Term, 2017 |

Helen M. Toor, J.

Kevin E. Brown of Langrock Sperry & Wool, LLP, Middlebury, for Plaintiff-Appellant.

Gary R. Kupferer of Webber, Chapman & Kupferer, Ltd., Rutland, for Defendant-Appellee.

PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.     **EATON, J.**  Wilbur Shriner, the holder of a homeowner's insurance policy from Amica Mutual Insurance Company (Amica), appeals the trial court's grant of summary judgment to Amica and denial of his cross-motion for summary judgment.  We affirm.

¶ 2.     This Court reviews a grant of summary judgment de novo and under the same standard as that applied by the trial court.  Co-op. Ins. Cos. v. Woodward, 2012 VT 22, ¶ 8, 191 Vt. 348, 45 A.3d 89.  We will uphold the decision of the trial court if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Id.; see also V.R.C.P. 56(a).

¶ 3.     The material facts in this case are undisputed.  Shriner, a retired physician, owned a glassblowing studio on Church Street in Burlington until he sold the property in December 2007 and moved the glassblowing equipment to his home in Charlotte.  He and his friend, also a

glassblower, eventually set up the equipment in the garage at Shriner's property and began making glass in late 2008 or early 2009. From 2009 to 2012, Shriner and his friend "sometimes made glass for a week or two, and then would shut down for weeks due to lack of money." During that three-year period, they made glassware approximately one time per week on average, and glassmaking was never more than an occasional or part-time activity for him. Throughout those three years, Shriner earned income from glassblowing, as well as from the redevelopment and rental of investment properties and from an organic honey and vegetable operation.

¶ 4.     Shriner and his friend called their enterprise Church and Maple Glass Studio and maintained a website from which customers could purchase their glassware. Shriner identified himself as an "artisan" on his tax forms, and in all years relevant to this case, he filed a Schedule C form for business profits or losses with the Internal Revenue Services (IRS). He described his business type as "blown glass manufacturing" on the IRS forms and reported sales ranging from $4036 in 2013 to $30,350 in 2010. He also reported business expenses for items including advertising, contract labor, legal and professional services, office space, meals, and entertainment.

¶ 5.     On January 12, 2012, the furnace exhaust system in a piece of glassmaking equipment malfunctioned and caused a fire that destroyed the garage and all of the property and equipment inside it. At the time, Shriner's home was covered by his homeowner's policy with Amica, which covered losses from fire and provided replacement coverage for buildings and personal property. The policy carried a $25,000 deductible and contained an exclusion from coverage for structures from which a business was conducted. Shriner submitted a personal property inventory for the property destroyed in the fire, with a replacement cost totaling $88,354.91. Amica accepted Shriner's fire-loss claim and determined the replacement cost of the garage to be $42,422.97. Amica applied the policy's $25,000 deductible and made an actual cash-value payment of $1460.53 as an advance partial payment to Shriner for the garage. Amica then changed positions and, asserting that Shriner's glassblowing activities constituted a "business" for the purposes of the policy's exclusion, refused to make any further payments to replace the garage.

2

Amica paid Shriner $11,613 for nonbusiness property that was destroyed in the garage but capped its payment for other property in the inventory at $2500, which was the maximum reimbursement permitted under the policy for "business" personal property. Shriner brought suit to recover the full amount of his claim, and the court granted summary judgment to Amica. This appeal followed.

¶ 6. An insurance policy is a contract and its interpretation is therefore a question of law for which this Court's review is nondeferential and plenary. Fireman's Fund Ins. Co. v. CNA Ins. Co., 2004 VT 93, ¶ 8, 177 Vt. 215, 862 A.2d 251. We give effect to the terms in an insurance policy according to their "plain, ordinary and popular meaning," and our interpretation of an insurance policy is guided by a "review [of] the language . . . from the perspective of what a reasonably prudent person applying for insurance would have understood it to mean." Woodward, 2012 VT 22, ¶ 9 (quotations omitted). Where policy language is ambiguous we resolve ambiguity in favor of the insured, "but we will not deprive the insurer of unambiguous terms place in the contract for its benefit." Fireman's Fund, 2004 VT 93, ¶ 9. Additionally, "[i]nsurance policies and their endorsements must be read together as one document and the words of the policy remain in full force and effect except as altered by the words of the endorsement." Id. ¶ 20 (quotation omitted). The insurer bears the burden of showing that an insured's claim is excluded by the policy. N. Sec. Ins. Co. v. Perron, 172 Vt. 204, 209, 777 A.2d 151, 154 (2001).

¶ 7. With those principles in mind, we look to the language of the policy at issue here. The policy capped recovery for "property, on the residence premises, used primarily for business purposes" at $2500 and excluded entirely from coverage "structures from which business is conducted" and "structures used to store business property." A Vermont-specific amendatory endorsement attached to the policy deleted the standard-form homeowner's policy definition of "business" and replaced it with the following language: "Business includes trade, profession or occupation."[1]

---

[1] The standard-form, deleted definition of "business" provided:

¶ 8.     Shriner argues that "the Court must read the policy and the amendatory endorsement together" and that reading the deleted language from the standard insurance provision and the amended language from the endorsement together creates ambiguity.  We cannot accept this attempted construction of the policy.  It is a basic rule of insurance policy construction that if an endorsement creates or expands an exclusion and the endorsement language is unambiguous, the insurer has carried its burden and the exclusion applies.  See, e.g., Clarendon Am. Ins. Co. v. Miami River Club, Inc., 417 F. Supp. 2d 1309, 1317-18 (S.D. Fla. 2006) (applying Illinois law); Liberty Mut. Ins. Co. v. Lone Star Indus., Inc., 967 A.2d 1, 28 (Conn. 2009).  Language deleted from a policy by an amendatory endorsement therefore cannot be considered for purposes of creating an ambiguity within the policy.  See Caudill Seed & Warehouse Co., Inc. v. Houston Cas. Co., 835 F. Supp. 2d 329, 337-38 (W.D. Ky. 2011) (applying Kentucky law); Ryan v. Mountain States Helicopter, 686 P.2d 95, 98-99 (Idaho 1984).  This position is consistent with the general rule of construction concerning endorsements to insurance policies that " 'if an endorsement extinguishes a policy provision or declares it void and of no effect, such provision cannot be considered in construing the policy.' "  Mountain States, 686 P.2d at 99 (quoting 2 R. Long, The Law of Liability Insurance, § 16.09 (rev. ed. 1983)); see also 4 E. Holmes, Holmes' Appleman on Insurance § 20.1, at 155 (2d ed. 2008) ("Such rules are consistent with the precept that provisions should not be read in isolation but must be considered as a whole with any conflicts being first

_____

"Business" means: a. A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or b. Any other activity engaged in for money or other compensation, except the following: (1) One or more activities, not described in (2) through (4) below, for which no insured receives more than $2,000 in total compensation for the 12 months before the inception  date of the policy period; (2) Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity; (3) Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or (4) The rendering of home day care services to a relative of an insured.

4

resolved by applying the terms of the endorsement. Then if the ambiguity persists, the ambiguity will be construed against the insurer." (emphasis added)).

¶ 9. Shriner argues that although his glassblowing was a part-time trade, profession or occupation, it nevertheless falls outside the policy because the Vermont endorsement "narrowed the definition of 'business' " by removing "part-time or occasional trade, profession, or occupation from the definition." However, the limitation Shriner seeks to apply was never in his insurance policy; the policy that Shriner purchased always deleted the standard-form definition of "business" and the "original" definition from the standard-form policy was never operative. The only definition of "business" that applied to Shriner was that in the Vermont endorsement, and our analysis therefore requires us to consider only the language of that endorsement. Thus, in interpreting the insurance policy at issue here, we cannot, as Shriner urges us to do, compare the language of the endorsement to the language of the standard-form provision unless we conclude that the endorsement language is facially ambiguous. Rather, our interpretation of the insurance policy begins with the policy language that is applicable to Shriner—namely, the Vermont-specific endorsement.

¶ 10. The endorsement provides: "Business includes trade, profession or occupation," and Shriner concedes that his glassblowing was at least a part-time trade, profession, or occupation. In effect, Shriner has conceded that his glassblowing is, at a minimum, a "business" under the policy definition that applied to him.[2] The only question we must answer, then, is whether the word "business" encompasses only full-time business or if it also includes part-time business.

---

[2] We have never specifically interpreted the word "business" in an insurance policy, and because Shriner concedes that his glassblowing was at least a part-time business, we need not decide whether the word "business" itself is ambiguous. The issue raised here is not whether Shriner's activities were a business, because he concedes that they were at least a part-time business. However, we note that we have repeatedly drawn the line between what constitutes a "business pursuit" and a "nonbusiness pursuit" in the context of homeowners' policies. See, e.g., Towns v. N. Sec. Ins. Co., 2008 VT 98, ¶ 10, 184 Vt. 322, 964 A.2d 1150; Lundeau v. Peerless Ins. Co., 170 Vt. 442, 446-47, 750 A.2d 1031, 1034 (2000). In drawing that distinction, we have adopted a context-specific inquiry that considers several factors, including whether the activity in question serves a "business purpose," whether it contributes to financial advantage by the insured,

5

¶ 11.   Bearing in mind that the policy at issue here was a homeowners' policy, we cannot conclude that the language of the endorsement was ambiguous as to the scope of the word "business": Shriner's policy unambiguously excluded from coverage property connected to full- and part-time business.  See Lundeau, 170 Vt. at 448, 750 A.2d at 1035 (explaining that court must consider nature of homeowners' policy and nature of risk involved in activity giving rise to insurance claim because "homeowner's policy [is] designed to insure primarily within the personal sphere of the policyholder's life and to exclude coverage for hazards associated with regular income-producing activities which involve different legal duties and a greater risk of injury or property damage" (quotation and alteration omitted)).  Shriner and Amica agree that glassblowing was at least an occasional or part-time trade, profession, or occupation for Shriner.  In practice, that meant that Shriner made glassware approximately once per week on average from 2009 to 2012.   Under Shriner's interpretation of his policy, any aggregation of income-generating enterprises, each done less than full-time, would not constitute a "business" and would therefore be immune from the exclusion.  This is not a reasonable interpretation and could not have been what the parties intended when Shriner purchased a homeowner's policy from Amica.  Although Shriner identified himself as an artisan on tax forms, he also filed a Schedule C form for business profits or losses with the IRS for every taxable year since 2003.  His tax documents reflect annual sales from glassmaking ranging from $4036 to $30,350, and he reported various business expenses.  His primary source of income throughout the relevant period was from a combination of selling glassware, redeveloping and renting investment properties, and selling products from an organic honey and vegetable operation.  Shriner acknowledges that he made glass in his garage, that he stored his glassmaking equipment in the garage, and that he used his glassmaking equipment to generate profit.

---

whether it generates profit for the insured, and the nature of the risk and coverage involved.  See Towns, 2008 VT 98, ¶¶ 10, 12.

6

¶ 12.    Amica argues that these things unambiguously constitute a "business" under the terms of the policy.  According to Shriner, on the other hand, "[m]aking glass is [his] art" and because it is an expensive hobby or trade, he "need[ed] to create some saleable product . . . to offset some of the cost of practicing the art form that [he] love[s]."  While Shriner may be correct that glassblowing is an expensive art, his interpretation of the insurance policy is foreclosed by our precedent: he conceded that he engaged in glassblowing as a trade, profession or occupation, and glassblowing generated profits for him.  See Towns, 2008 VT 98, ¶ 10.  His enterprise need not be exclusive or quotidian to constitute a business.  Because the policy unambiguously excluded from coverage any property connected to a trade, profession, or occupation, Shriner's garage and glassblowing equipment were excluded.  Thus, we conclude, based on the record of undisputed material facts before us, that Shriner's glassblowing was a full- or part-time business and that coverage for the garage and business property was precluded under the business exclusion.  Amica met its burden and the court below properly granted summary judgment in its favor.

Affirmed.

FOR THE COURT:

_____
Associate Justice

7